

B. McKay Mignault, Chief Bankruptcy Judge
United States Bankruptcy Court

**Dated: October 3rd, 2022**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BLUEFIELD

| | |
|---|---|
| IN RE: <br><br> RUSSELL LEE NICEWANDER and STACI RENEE NICEWANDER, <br><br> Debtors. | CASE NO. 1:20-bk-10049 <br><br> CHAPTER 7 <br><br><br> JUDGE B. MCKAY MIGNAULT |
| TRACI S. NICEWANDER, <br><br> Plaintiff, <br> v. <br><br> RUSSELL LEE NICEWANDER, <br><br> Defendant. | ADVERSARY PROCEEDING NO. 1:20-ap-01003 |

## MEMORANDUM OPINION AND ORDER

This adversary proceeding was commenced by Traci S. Nicewander ("Plaintiff") on September 17, 2020. Plaintiff's Complaint [dkt. 1] (the "Complaint") asserts that Russell Lee Nicewander ("Defendant") owes a debt to Plaintiff in the amount of $63,479.31, plus interest, that is nondischargeable under 11 U.S.C. § 523(a)(4).

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

I. BACKGROUND

The factual background of this matter is largely stipulated to by the parties, having previously been established in a pre-petition suit brought by Plaintiff against Defendant in the Circuit Court of Mercer County (the "Circuit Court Action").

Plaintiff married Phillip Todd Nicewander on May 25, 1991. Pl. Exh. 1 (Final Order Following Bench Trial), p. 1. Phillip Todd Nicewander was known as "Todd" Nicewander and was the brother of Defendant. *Id.* Todd Nicewander and Defendant were very close. *Id.*

Plaintiff's father, Jack Sells, died on or about June 25, 2003, leaving most of his estate to Plaintiff. *Id.* at 2. At the time of his death, Mr. Sells was in default on a note secured by certain real estate located in Mercer County (the "Real Estate"). *Id.* Consequently, the Real Estate was sold on the courthouse steps on October 26, 2004. *Id.* Todd Nicewander cast the highest bid for the Real Estate, and Plaintiff subsequently paid 100% of the $21,981.00 purchase price using funds inherited from her father's life insurance policy. *See id.*

Although Plaintiff paid full consideration for the Real Estate, she and Todd Nicewander caused the Real Estate to be placed in Defendant's name because, at the time, Plaintiff was defending litigation brought by her mother, Barbara Sells, to contest her inheritance from Jack Sells. *Id.* at 2.[1] Within three or four days after the sale, Todd Nicewander notified Defendant that the Real Estate would be titled in Defendant's name, and Defendant agreed. *Id.* at 3.

On November 17, 2004, Todd Nicewander signed a handwritten note prepared by Plaintiff directing the Trustee for the Deed of Trust to the Real Estate to place Defendant's name

---

[1] On September 29, 2008, the Circuit Court of Mercer County determined that Barbara Sells was not properly married to Jack Sells on the date of his death and rejected her claims to share in his estate. *Id.* at 2.

on the deed to the Real Estate. *Id.* Defendant was named on the deed, and that deed was recorded January 22, 2007, in Deed Book 906, Page 479 in the Office of the Clerk of the County Commission in Mercer County. *Id.*

Plaintiff and Todd Nicewander subsequently treated the Real Estate as their own property, including paying for real estate taxes and maintenance and holding family gatherings on the Real Estate. *Id.* Defendant admits that he agreed to hold title to the Real Estate for his brother and Plaintiff, but that Plaintiff was the owner of the Real Estate. *Id.*

Sometime in 2014, approximately ten years after purchasing the Real Estate, Plaintiff, Todd Nicewander, and Defendant agreed to sell the Real Estate. *Id.* at 4. Plaintiff communicated with the realtor and provided the keys to the property to enable it to be listed and sold. *Id.* Judy A. Elkins purchased the Real Estate on November 18, 2014, for $72,500.00. *Id.* After payment of closing costs, $66,479.31 remained in sale proceeds. *Id.* To convey clear title to Ms. Elkins, $16,020.24 of these proceeds was applied to satisfy Defendant's delinquent personal and business taxes that had converted to a lien against the Real Estate. *Id.* On December 2, 2014, the closing agent provided a check payable to Defendant for the remainder, in the amount of $50,450.07. *Id.* Upon receipt of the check on December 2, 2014, Defendant cashed the entire check at First Century Bank. *Id.* at 5.

The parties' disagreement during the Circuit Court Action centered on what was done with the cash. There is no dispute that Defendant kept $3,000.00 of the sale proceeds to cover the capital gain taxes he would be required to pay because of the sale. *See id.* at 5. Plaintiff has stipulated that Defendant should be able to retain this $3,000.00 from the sale proceeds for payment of capital gains taxes he would be required to satisfy because of the sale of the real estate. *See* Pl.'s Brief [dkt. 58] at 7.

3

Defendant claimed in the Circuit Court Action that he tendered the remaining $47,500.00 in cash to Plaintiff at his residence. *Id.* at 5. Defendant claimed that no witnesses were present (not even his brother, Todd) during the exchange and that he did not obtain a receipt. *Id.* Plaintiff, on the other hand, denied receiving any cash from Defendant. *Id.* Plaintiff's financial affairs at the time show that she had no cash from 2015–2016. *Id.* Plaintiff and Todd Nicewander filed for divorce in March of 2015, and Plaintiff's mortgage remained in default from August of 2015 through September 27, 2016, when the final divorce decree was entered. *Id.* at 1, 5. Plaintiff borrowed money from relatives to make her mortgage payments in May of 2016 when Todd Nicewander fell behind on making the payments. *Id.* Todd Nicewander was terminally ill with pancreatic cancer at the time, and Paragraph 7(a) of the final divorce decree specifically provided that the proceeds of his life insurance policy would be first paid to satisfy the outstanding mortgage on the marital residence, in which Plaintiff would retain a life estate. *Id.* at 5–6. Todd Nicewander was also ordered to keep the monthly payments current from September 2016 until the time of his death. *Id.* at 6.

Paragraph 7(i) of the final divorce decree also specifically waived any and all claims Todd Nicewander held against Defendant related to sale of the Real Estate. *Id.* The paragraph states that:

> The husband waives any possible claim of the wife to secure proceeds from the sale of real estate (owned by her father) that was put in his brother's name due to a pending lawsuit against the wife at the time of the purchase and sale of the same. The brother's name is Russell L. Nicewander and he conveyed the subject property to Judy A. Elkins on or about November 14, 2014, by deed recorded in Office of the County Commission of Mercer County, West Virginia, in Deed Book 1012 at Page 615.

*Id.*; Pl. Exh. 11, ¶ 7(i).

On November 9, 2016, Plaintiff filed the Circuit Court Action against Defendant in

4

the Circuit Court of Mercer County (the "Circuit Court Action") to recover the proceeds of the sale of the Real Estate. Pl. Exh. 1, p. 2.

Todd Nicewander attended a hearing regarding Defendant's motion to dismiss in the Circuit Court Action in June of 2017, but offered no testimony or affidavit. *Id.* at 6. Todd Nicewander died on or about July 22, 2017. *Id.*

On February 24, 2020, the Circuit Court of Mercer County entered a final judgment (the "Circuit Court Order") against Defendant for the sum of $63,479.31 together with pre-judgment and post-judgment interest. After consideration of testimony and nineteen exhibits presented at a bench trial, the Circuit Court concluded that: (a) Plaintiff proved by clear and convincing evidence and uncontradicted testimony that Defendant held the Real Estate in trust for Plaintiff, and (b) Defendant did not prove by a preponderance of the evidence that he paid the $47,500.00 in cash from the sale proceeds to Plaintiff. *Id.* at 7–9. The Court reached the latter conclusion based on the following facts:

(1) Defendant claimed he paid the sum of $47,500.00 in cash when most reasonable people would pay by check or at least obtain a written receipt;

(2) It is not credible that Defendant would give Plaintiff $47,500.00 in cash without his close brother, Todd, or any other witness present;

(3) Defendant did not agree that he owed the $16,020.24 used to satisfy his own tax liens until the Circuit Court Action commenced;

(4) Todd Nicewander would not have waived his right to Plaintiff's claim against his brother in Paragraph 7(i) of his divorce decree if no such claim existed;

(5) Plaintiff's finances after the sale of the Real Estate (with her home in prolonged default and having to take a personal loan from a family member to pay the mortgage) were inconsistent with a person who received $47,500.00 in cash; and

(6) Defendant falsely claimed that Plaintiff waited until Todd Nicewander died to bring her claim, but the Circuit Court Action was filed prior to Todd Nicewander's death, and Todd Nicewander was even present during a hearing on a motion to dismiss the Circuit Court Action.

*Id.* at 9–10.  Defendant did not appeal the Circuit Court Order.

Defendant and his wife Staci Renee Nicewander filed a Chapter 7 bankruptcy petition in this district on June 19, 2020.  *See* Bankr. Case No. 1:20-bk-10049.

Plaintiff commenced this nondischargeability adversary proceeding on September 17, 2020.  With leave of the Court, an *Amended Complaint* was filed on February 26, 2021 [dkt. 24], and an *Answer* was filed March 15, 2021 [dkt. 26].

On June 11, 2021, Plaintiff filed a *Motion for Summary Judgment* [dkt. 30] and *Memorandum in Support* [dkt. 31], requesting that this Court grant summary judgment and determine that Defendant's debt to her of $63,479.31, plus interest, is nondischargeable under 11 U.S.C. § 523(a)(4) based upon the doctrines of *res judicata* and collateral estoppel.  On July 23, 2021, Defendant filed a *Response* [dkt. 38] arguing that summary judgment is not appropriate because the Order entered in the Circuit Court Action did not include any findings of fact regarding intentional or reckless conduct on the part of Defendant, which is required to obtain a nondischargeability ruling pursuant to § 524(a)(4).  Plaintiff filed a *Reply* [dkt. 39] on August 2, 2021, arguing that (1) the Court should grant summary judgment and find that Defendant was a trustee and a fiduciary; (2) the Court should grant summary judgment against Defendant under § 524(a)(4) because the Circuit Court determined that Defendant could not prove by a preponderance of the evidence that he paid the sale proceeds to Plaintiff and, if he did not do so, he converted, embezzled, or stole those funds; and (3) even if the Court declines to enter summary judgment, it should enter partial summary judgment and treat the Circuit Court's findings of fact as established in this case under Rule 56(g) of the Federal Rules of Civil Procedure (made applicable herein by Federal Rule of Bankruptcy Procedure 7056).

On September 30, 2021, the Court entered a *Memorandum Opinion and Order* [dkt. 40], which held that, although *res judicata* principles are inapplicable in the bankruptcy

nondischargeability context, collateral estoppel applies and bars the parties from relitigating identical issues previously decided in the Circuit Court Order, including that (a) a resulting trust under West Virginia common law was created at the time that Plaintiff paid for the Real Estate, ten years prior to the debt and any alleged wrongdoing by Defendant, in satisfaction of the fiduciary element of 11 U.S.C. § 524(a)(4); and (b) that Defendant failed to pay the $47,500 in proceeds he received from the Real Estate to Plaintiff.  Summary judgment was denied, however, because Plaintiff must establish that Defendant had a culpable state of mind to satisfy the evidentiary test for both defalcation and embezzlement under 11 U.S.C. § 523(a)(4).  Additionally, the Court also noted that the record required further development regarding the nature of the Defendant's debt to repay Plaintiff approximately $16,000 in sale proceeds used to satisfy his delinquent taxes because it is unclear whether that use was authorized by Plaintiff to permit the sale to close free of tax liens or was never authorized.

On Friday, November 19, 2021, a trial was held at the Robert C. Byrd U.S. Courthouse in Beckley, West Virginia (the "Trial").  Plaintiff and Defendant each appeared in person and were represented by counsel.  Plaintiff and Defendant each testified at Trial.  The parties also stipulated to the admission of fourteen (14) exhibits.

After the Trial, the parties submitted proposed findings of fact and conclusions of law.  *Plaintiff's Proposed findings of Fact, Conclusions of Law, and Order* [dkt. 58] ("Pl.'s Brief") seeks a Court order declaring that the entire judgment of $63,479.31, plus pre-judgment and post-judgment interest, is non-dischargeable, including the $16,020.24 used to satisfy his tax liens against the Real Estate at closing.  Plaintiff also seeks attorney's fees and costs.  *Defendant, Russell Lee Nicewander's Proposed Findings of Fact and Conclusions of Law* [dkt. 59] seeks an Order denying the relief sought in the Complaint because Plaintiff failed to meet her burden to prove the

7

culpable state of mind required to obtain a nondischargeability ruling.

The matter is ready for adjudication.

## II.    ANALYSIS

### A. *Defalcation While Acting in a Fiduciary Capacity*

To establish an exception to discharge for debts arising from defalcation while acting in a fiduciary capacity, Plaintiff must show, by a preponderance of the evidence, the existence of both (1) a fiduciary relationship and (2) defalcation while acting in that fiduciary capacity. *See Grogan v. Garner*, 498 U.S 279, 283, 291 (1991) (applying a preponderance of the evidence standard to § 523(a) causes of action).

As recognized in the September 30, 2021 *Memorandum Opinion and Order* [dkt. 40], the Circuit Court Order's determination that a resulting trust under West Virginia common law was created at the time that Plaintiff paid for the Real Estate, ten years prior to the debt and any alleged wrongdoing by Defendant, satisfies the fiduciary element of § 524(a)(4). The first evidentiary requirement to prove defalcation has been established.

Second, Plaintiff must show, by a preponderance of the evidence, that Defendant committed an act of defalcation while acting as a fiduciary. While the precise meaning of "defalcation" for purposes of § 523(a)(4) has never been entirely clear, the Fourth Circuit has described the tort of defalcation as "'the failure to meet an obligation' or 'a nonfraudulent default.'" *Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir. 2001) (citing *Black's Law Dictionary* 427 (7th ed. 1999)), abrogated on other grounds by *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013). Other courts have also described defalcation as "a failure to produce funds entrusted to a fiduciary." *In re Fernandez-Rocha*, 451 F.3d 813, 816 (11th Cir. 2006) (citing *Quaif v. Johnson*, 4 F.3d 950, 955 (11th Cir. 1993)).

Additionally, the Supreme Court has included a state of mind requirement for defalcation. In *Bullock v. BankChampaign, N.A.,* the Supreme Court held that defalcation under § 523(a)(4) includes a culpable state of mind requirement "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock*, 569 U.S. at 269. An intentional wrong encompasses "not only conduct that the fiduciary knows is improper, but also reckless conduct of the kind that the criminal law also treats as equivalent[,]" such as when a fiduciary "consciously disregards (or is willfully blind to) a substantial and unjustifiable risk" that his conduct will result in a breach of fiduciary duty." *Id*. at 273–74.

As recognized in the September 30, 2021 *Memorandum Opinion and Order* [dkt. 40], the Circuit Court Order determined that the Defendant failed to pay the $47,500.00 in proceeds of the sale of the Real Estate to Plaintiff. What remains to be proven is whether Defendant engaged in intentional or reckless conduct as required by *Bullock v. BankChampaign, N.A.*

The Court will first consider this question with respect to the $16,020.24 in sale proceeds that was applied at closing to satisfy Defendant's delinquent personal and business taxes that had converted to a lien against the Real Estate. The Court finds that Plaintiff has not shown evidence sufficient to establish that Defendant had a culpable state of mind regarding this $16,020.24.

From the testimony of the parties, this payment was set up at closing by the closing attorneys to permit the transaction to close. Ms. Nicewander made the ultimate decision to accept the offer from Ms. Elkins. 11/19/2021 Tr. at 33:13–16. She also approved the sale price and the terms of the sale. 11/19/2021 Tr. at 33:19–21. She did so over the phone, and the realtor may have also texted her and/or emailed her husband Todd Nicewander regarding matters pertaining to the house. 11/19/2021 Tr. at 56:24–59:11.

Mr. Nicewander testified that, although the realtor was his cousin, he was not involved in accepting the sale offer, and he had no clue about the sale price or terms until he went to sign the papers. 11/19/2021 Tr. at 42:13–24. While Defendant knew he had tax liens, he was unsure of the amount of the liens until he sat down at the closing table. 11/19/2021 Tr. at 43:23–44:10. Defendant never controlled the $16,020.24, nor did he directly control the use of those funds to pay the tax liens other than by signing the closing documents. 11/19/2021 Tr. at 44:18-22. When he sat down to sign the closing papers, he was told the full amount of the tax liens and that they would have to be paid before the house could be sold. 11/19/2021 Tr. at 43:11–44:10.

Plaintiff became aware of the tax liens at some point when the sale was underway, though she could not recall whether it was before or after the closing. 11/19/2021 Tr. at 33:22–34:9. She also could not recall who told her the liens had been paid from the proceeds or when. 11/19/2021 Tr. at 34:15–35:11. However, she never discussed the use of sale proceeds to satisfy Defendant's tax liens with Defendant, and Defendant never discussed them with Plaintiff. 11/19/2021 Tr. at 35:13-16; 44:11–45:6.

In fact, perhaps the only thing Plaintiff and Defendant agree on is that they largely had no communication relating to the marketing and sale of the Real Estate. Ms. Nicewander never told Defendant that the offer for the Real Estate was accepted. 11/19/2022 Tr. at 59:14-21. Communications during the marketing and sale process were typically through the realtor, with Plaintiff and Defendant communicating less than a handful of times. 11/19/2021 Tr. at 59:22–60:16. Plaintiff could not remember the specifics of a single conversation with Defendant relating to the marketing and sale of the real estate except one. 11/19/2021 Tr. at 60:8-20. That conversation occurred on the Christmas Eve after closing; Plaintiff testified that she asked Defendant for the sale proceeds, he did not respond to her, and she did not pursue the matter to

avoid starting a fight at Christmas. 11/19/2021 Tr. at 25:1–15. Defendant testified that he never discussed the closing or anything about closing with Plaintiff. 11/19/2021 Tr. at 45:2-6.

With respect to the $47,500.00 in sale proceeds that Defendant cashed and then did not pay to Plaintiff, the Court, after weighing all the evidence presented at Trial, finds that the evidence does establish that Defendant had a culpable state of mind and wrongful intent. Significantly, Defendant is an experienced businessman who has operated a business since 1999 and "hardly ever" transacted business in cash. 11/19/2021 Tr. at 71:11-13, 74:6-10. Yet, he cashed the $50,459.07 check despite personnel at the bank cautioning him by "ask[ing] me why – why I would go out there with that much cash money…." 11/19/2021 Tr. at 48:11–59:2. Defendant, who maintains that he paid the cash to Plaintiff despite the record being established to the contrary, testified that the reason he cashed the check was that "I knew [Plaintiff's] not dumb enough to put the money in a bank account." 11/19/2021 Tr. at 47:10-12.

Stated a different way, Defendant claims to have essentially done Plaintiff a favor by cashing the check so she could avoid putting the money in the bank where it would be traceable. The Court finds that this testimony is simply not credible. The record establishes that Plaintiff and Defendant barely spoke during the time period that the Real Estate was marketed and sold. Defendant, as an experienced businessman, knows the risks and benefits of transferring funds in a protected and traceable manner through banking institutions versus transacting in cash. Plaintiff did not ask to receive the funds in cash, and Defendant gave no reason why Plaintiff would want her funds in cash. It is unreasonable to assume that any person would prefer to receive $47,500 in cash. Defendant admitted that if he had written Plaintiff a check or taken her a money order or cashier's check, she could have cashed her own check if she wanted to. 11/19/2021 Tr. at 50:5-10. The more likely and logical explanation for Defendant cashing the $50,000 check received at

closing is so he could use them for his own purposes without leaving any paper trail or evidence. For these reasons, the Court finds that the check was cashed and not paid to Plaintiff with wrongful, culpable intent on the part of Defendant.

### B. Embezzlement

Under § 523(a)(4), embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Harrold v. Raeder (In re Raeder)*, 399 B.R. 432, 439 (Bankr. N.D.W. Va. 2009) (*quoting Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998)) (internal quotation marks omitted). Unlike larceny, embezzlement occurs when "the original taking of the property was lawful, or with the consent of the owner." *Id.* at 439. Embezzlement further requires a showing of wrongful intent. *Bullock*, 569 U.S. at 274 (internal citations omitted).

As with defalcation, the Circuit Court Order established that the Defendant appropriated Plaintiff's property by failing to pay the proceeds of the sale to her. All that remains to be determined is whether Defendant had wrongful intent when he did so. For the same reasons as given above, the Court finds that Defendant (a) did not have such wrongful intent with respect to the $16,020.24 used at closing to pay his tax liens, but (b) did have wrongful intent when he cashed the $47,500 in sale proceeds but did not pay them to Plaintiff.

### III. CONCLUSION

Plaintiff requests the Court to declare a debt of $63,479.31, plus interest, nondischargeable. The evidentiary record before the Court demonstrates that Defendant's actions constitute both defalcation and embezzlement under 11 U.S.C. § 523(a)(4) with respect to the

$47,500 in net sales proceeds that Defendant failed to pay to Plaintiff, but not with respect to the $16,020.24 in sales proceeds used to satisfy Defendant's tax liens at closing. Therefore,

**IT IS ORDERED** that the judgment of the Circuit Court of Mercer County, West Virginia, in favor of Plaintiff and against Defendant is **NONDISCHARGEABLE** with respect to the $47,500 in sale proceeds that Defendant cashed and did not pay to Plaintiff, together with prejudgment interest from December 2, 2014 to February 24, 2020 and post judgment interest thereafter until said judgment is satisfied.

**IT IS FURTHER ORDERED** that, while each party shall bear their own costs, Defendant must pay to Plaintiff one half of the cost of the transcript required for this proceeding in the amount of $246.00.

The Clerk's Office shall serve a copy of this written opinion and order on Plaintiff, Plaintiff's Counsel, Defendant, Defendant's Counsel, and the United States Trustee.